**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| KATHERINE LAWRENCE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:13-cv-01535-TWP-MJD |
| ) | |
| CAROLYN COLVIN, Acting Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Katherine Lawrence ("Ms. Lawrence") requests judicial review of the final

decision of the Commissioner of the Social Security Administrator (the "Commissioner"), denying

her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") under Titles II and XVI of the Social Security Act ("the Act"). For the following reasons,

the Court **AFFIRMS** the Commissioner's decision.

## I.  BACKGROUND

### A.     Procedural History

Ms. Lawrence filed her application for DIB and SSI on February 12, 2010, alleging a

disability onset date of January 1, 2008. Her claim was initially denied on July 15, 2010, and again

upon reconsideration on September 21, 2010. Thereafter, Ms. Lawrence requested a hearing on

December 7, 2010, and on September 7, 2011, a hearing was held before Administrative Law

Judge Stephen R. Woody ("the ALJ"). Ms. Lawrence was represented by counsel, and vocational

expert Deborah Bunn-Durham ("the VE") testified. On February 23, 2012, the ALJ denied Ms.

Lawrence's application and on July 18, 2013, the Appeals Council denied her request for review

of the ALJ's denial, thus making it the final decision of the Commissioner for the purposes of

judicial review. 20 C.F.R. § 416.1481. On September 23, 2013, Ms. Lawrence filed this appeal requesting judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**B.    Factual and Medical Background**

At the time of her alleged disability onset date, Ms. Lawrence was twenty-five years old. She has obtained a GED and has previously worked as a certified nursing assistant, waitress, fast food worker and cashier in the time period from 1998 to 2010. Ms. Lawrence is married but separated from her spouse. At the time of her hearing she was twenty-nine years old and lived with her mother.

Ms. Lawrence began treatment at Gallahue Mental Health Services ("Gallahue") in August 2007, reporting suicidal ideation, depression, and anxiety. She was diagnosed with major depressive disorder, recurrent-moderate symptoms and borderline personality disorder to be ruled out, and assigned a global assessment functioning ("GAF") of 35.

In April 2008, Ms. Lawrence returned to Gallahue, presenting a fear of hurting individuals who provoked her, and reported being fired from jobs for physically fighting with others. She was diagnosed with bipolar disorder, post-traumatic stress disorder ("PTSD"), attention-deficit/hyperactivity disorder by history, and borderline personality disorder by history, and assigned a GAF of 50. In May 2008, Ms. Lawrence was discharged from Gallahue with a diagnosis of major depressive disorder with recurrent-moderate symptoms, PTSD, and both bipolar disorder and borderline personality disorder to be ruled out. At that time, she was assigned a GAF of 55.

Ms. Lawrence next sought treatment at Gallahue in February 2009, reporting depressed mood, mood swings, sleep problems, appetite problems, irritability, and anxiety. Thereafter she missed two appointments and cancelled a third due to transportation problems.

On April 9, 2010, she reported to Matthew G. Grant, Psy.D., HSPP ("Dr. Grant") for a consultative examination. She received a mental status evaluation and Dr. Grant administered the Weschler Adult Intelligence Scale, Fourth Edition ("WAIS-IV") test. During the interview, she was alert and her thought was organized. She exhibited appropriate attention and concentration levels, worked hard, displayed an eagerness to do well, and remained interested in the task at hand.

In his initial analysis, Dr. Grant concluded from the WAIS-IV examination that Ms. Lawrence's overall intellectual functioning, as estimated by the Full Scale IQ score, fell within the extremely low range, and that her score of 59 was consistent with a diagnosis of mild mental retardation. He diagnosed her with intermittent explosive disorder, panic disorder without agoraphobia, and generalized anxiety disorder—which were affirmed by David W. Mardis, M.A., L.M.H.C., L.C.A.C. ("Mr. Mardis"), in an assessment at Gallahue on December 7, 2010. Dr. Grant assigned a GAF score of 20, and noted Ms. Lawrence's frequent aggression towards others.

On June 14, 2010, Donna Unversaw, Ph.D. ("Dr. Unversaw"), the state agency medical expert, contacted Dr. Grant and asked him to reconsider his initial analysis in light of the following:

> Historically, this claimant has obtained a GED, has worked as CNA (thus has passed training), has worked for sustained periods of time as a cashier, and at the time of the CE was a new hire at McDonalds working the drive through. In addition, she has had a driver's license though suspended due to citations she can ride public bus system. Her mother reports adls [activities of daily living] that describe her as being cap[able] of performing all routine tasks for self and home when motivated. She has a long hx [history] of da/a [drug abuse or alcoholism] and is not reliable in her claims as such was denied by you despite medical records to the contrary. She does have a long hx of frequent conflicts with others, in particular boyfriends. In light of her adaptive fxing [functioning], obtaining GED, and work hx, her obtained scores are not consistent with this history. She was not reliable in her reports to you re: alcohol/drugs and adls; do you still consider her score to be valid and fully representative of her fxing? Would BIF [borderline intellectual functioning] better capture her fxing?

(Filing No. 8-9, at ECF pp. 32-34; see Filing No. 20, at ECF p. 4 (offering full form translation)).

In response, on June 29, 2010, Dr. Grant amended his diagnosis and wrote:

Although the claimant reported difficulties with her activities of daily living and difficulty counting money, based on the function report provided by the claimant's mother and received by this examiner on June 28, 2010, the claimant appears to need little assistance regarding her activities of daily living. The claimant has also received a general education diploma in 2007. Based on the claimant's inconsistencies and recent information provided to this examiner, the claimant's intellectual functioning would be more consistent with a diagnosis of Borderline Intellectual Functioning[.] The claimant[']s scores in the WAIS-IV may have been affected by the claimant's depression, anxiety, labile mood, and some level of attraction.

(Filing No. 8-9, at ECF p. 80).

On July 2, 2010, Keith Magnus, Ph.D. ("Dr. Magnus"), a psychological consultant at the Disability Determination Bureau, completed a Psychiatric Review Technique form ("PRTF"), and a Mental Residual Function Capacity Assessment form ("Mental RFC assessment") on Ms. Lawrence. Dr. Magnus' PRTF indicated that Ms. Lawrence had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace—but had experienced no episodes of decompensation. In the Mental RFC assessment, Dr. Magnus summarized the medical evidence, and noted in narrative form that Ms. Lawrence had a GED, had gone through CNA training, had worked as a waitress and was currently working at McDonald's drive-through window. Furthermore, Dr. Magnus found that this "totality of the evidence [was] not consistent" with the findings of Mental Retardation, and that Ms. Lawrence retained the ability to perform at least simple, routine tasks in a work environment. Dr. Magnus' opinion was affirmed by B. Randal Horton, Psy.D., another state agency medical expert who reviewed Ms. Lawrence's file, on September 21, 2010.

On September 9, 2010, Roberta Lawrence, the mother of Ms. Lawrence, submitted a third party Function Report which indicated that Ms. Lawrence would regularly care for her personal

hygiene, eat and try to cook meals, but would not stay engaged with daily chores or schooling. She also explained that her daughter cared for her father, fed and cleaned up after pets, and had no problems with personal care, but would sometimes need reminders to care for personal needs and to take her medicine. Her mother further reported that Ms. Lawrence did housework such as dusting, cleaning the bathroom and kitchen, and yard work, such as mowing and pulling weeds, and every day when going out, would walk, ride a bike, take public transportation, or either drive or ride in a car. Additionally, the report shared that Ms. Lawrence shopped in stores for food and clothing, but did not do so for long periods since waiting in line posed a major problem. She also was able to count change but, because of a desire to "blow through [money] like water," was unable to pay bills, handle a savings account, or use a checkbook.

Ms. Lawrence returned to Gallahue on November 29, 2010, nearly two years after her last appointment, complaining of depression, anxiety, mood disorder, bipolar disorder as well as relationship, impulse control, behavior, and violence problems. In December 2010 she began treatment with a counselor, David Mardis. Following an interview and evaluation, Mr. Mardis offered a diagnostic impression of bipolar disorder, intermittent explosive disorder, antisocial traits, and borderline personality disorder, and assigned Ms. Lawrence a GAF score of 55. Throughout the remainder of her treatment ending in May 2011, the GAF score fluctuated, ranging from 45 in late December 2010 to 60 in early March 2011.

On August 23, 2011, Mr. Mardis completed a Mental Residual Functional Capacity Questionnaire ("the Mental RFC questionnaire"), which indicated Ms. Lawrence suffered from generalized anxiety disorder, intermittent explosive disorder, PTSD, bipolar disorder, and borderline personality disorder. In the Mental RFC questionnaire, Mr. Mardis checked boxes to indicate Ms. Lawrence's signs and symptoms across several areas and her abilities and aptitudes

to do unskilled work—though he did not offer any explanation for the former as instructed. Mr. Mardis' assessment also indicated that Ms. Lawrence was unable to meet competitive standards for three of the four required mental abilities and aptitudes needed to complete semiskilled and skilled work, and had no useful ability to function in the remaining area. Mr. Mardis opined that she did not have a low IQ or reduced intellectual functioning.

## C.  The Administrative Hearing

On September 7, 2011, Ms. Lawrence appeared in Indianapolis, Indiana for a hearing before the ALJ by way of video-teleconference, where she testified that she had obtained a GED and attempted to take college courses but, because of getting into trouble, had to drop out. Ms. Lawrence previously had a driver's license and lost it after failing to pay tickets. She also described numerous jobs from which she had been fired for "fighting", including a McDonald's cashier position for two or three months and a TGI Fridays waitress position.

Ms. Lawrence testified that she took both special education and normal classes in school, as well as attending "alternative schools" for people who were not "normal." When describing what she did around the house, she shared that she washed the dishes, vacuumed, scrubbed the floors, cooked meals such as pork chops and did laundry every day—but did not dust.

The VE was asked by the ALJ to consider a hypothetical individual who was the same age as Ms. Lawrence, had the same education and work experience, and had further limitations.[1] The VE testified that the hypothetical individual described could perform the light, unskilled jobs of a

---

[1] She had the capacity to perform medium [sic] work, with the following limitations: she should avoid concentrated exposure to hazards; is limited to unskilled work and carrying out simple instructions; performing simple, routine tasks involving little independent decision making and few work place changes; and needed to work primarily with things rather than people, with no requirement for regular interaction with the general public and only superficial interaction with others.

garment folder (with 400 positions existing in the State of Indiana), garment turner (200 positions), and silver wrapper (250 positions).

**D.      The ALJ's Decision**

The ALJ made the following findings as part of his decision.  First, the ALJ determined that Ms. Lawrence met the disability insured status requirements of the Act through December 31, 2011.  Then, at step one, the ALJ found that Ms. Lawrence had not engaged in substantial gainful activity since the onset date of her alleged disability of January 1, 2008.  At step two, the ALJ found that she had the following severe impairments:  mild lumbar degenerative disc disease and osteoarthritis of the lumbar spine, obesity, mood disorder, generalized anxiety disorder, borderline intellectual functioning, and intermittent explosive disorder.  At step three, the ALJ found that the impairments did not, singly or in combination, meet or medically equal any of those included in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1.  At step four, the ALJ found that Ms. Lawrence had the residual functional capacity ("RFC") to perform light work that required she only occasionally balance, stoop, bend, kneel, crouch, crawl, and climb; should avoid concentrated exposure to hazards such as unprotected heights and dangerous machinery, is limited to unskilled work, carrying out simple instructions and performing simple, routine tasks involving little independent decision-making and few workplace changes; and should work primarily with things rather than people, with no requirement for regular interaction with the general public and with only superficial interaction with others.  The ALJ determined that, as a result, Ms. Lawrence could not perform any past relevant work.  At step five, the ALJ found that, given her age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Ms. Lawrence could perform.  The ALJ concluded that Ms. Lawrence had not been under a disability from January 1, 2008 through the date of the decision.

## II. DISABILITY STANDARD OF REVIEW

Under the Act, a claimant is entitled to DIB or SSI if the claimant establishes a disability, defined under 42 U.S.C. § 423(d)(1)(A) as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." Under the authority of the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. 20 C.F.R. §§ 404.1520 and 416.924. The steps are followed in order. If disability status can be determined at any step in the sequence, the application will not continue to the next step. *Id.*

At step one, if the claimant is currently engaged in substantial gainful activity ("SGA"), then the claimant is not found to be disabled, regardless of the severity of his or her physical or mental impairments, and regardless of age, education and work experience. 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the individual is not engaged in SGA, the analysis proceeds to the second step.

At step two, if the claimant's medically determinable impairments are not severe, then he or she is not found to be disabled. 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment within the meaning of the regulations is one that "significantly limits an individual's ability to perform basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.924(c). An impairment is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. §§ 404.1520(c) and 416.924(c); *see also* SSR 85-28; SSR 96-3p; SSR 96-4p. If the individual has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, if the claimant's impairments, either singly or in combination, meets or medically equals the criteria for any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1, and meets the duration requirement, 20 C.F.R. §§ 404.1509 and 416.909, then he or she is found to be disabled. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, and 416.920(d). If it does not meet any of the listed impairments, the analysis proceeds to the next step.

Before considering the fourth step, the claimant's RFC is determined. 20 C.F.R. §§ 404.1520(e) and 416.920(e). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from impairments. See 20 C.F.R. §§ 404.1545 and 416.945. All of the claimant's impairments, including impairments that are not severe, are considered in finding the RFC. 20 C.F.R. §§ 404.1520(e) and 404.1545; see also SSR 96-p.

At step four, if the claimant has the RFC to perform his or her past relevant work, then the claimant is not found to be disabled. 20 C.F.R. §§ 404.1520(f) and 416.920(f). If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process, if the claimant, given his or her RFC, age, education and work experience, is able to do any other SGA which exists in the national economy, then he or she is not found to be disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g). Although the claimant continues to have the burden of proving disability at this step, a limited burden is shifted to the Commissioner at this step to prove evidence that demonstrates other work exists in significant numbers in the national economy that the claimant can do. 20 C.F.R. §§ 404.1512(g), 404.1560(c), 416.912(f); see also *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Act provides for judicial review of the Commissioner's denial of benefits. 42 U.S.C. § 405(g). When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become those of the Commissioner. See *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). The findings of the Commissioner "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The limited role of the Court on judicial review under 42 U.S.C. § 405(g) is to determine whether there is substantial evidence in the entire record to support the fact findings or decision of the ALJ, as the trier of facts. This Court must review the entire record, *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992), and sustain the ALJ's findings if it finds "such evidence as a reasonable mind might accept as adequate to support a conclusion," *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Perales*, 402 U.S. 389). Since the Commissioner is responsible for weighing the evidence, resolving conflicts and making independent findings of fact, see *Perales*, 402 U.S. at 399–400, a reviewing court may not decide the facts anew, re-weigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled, *Powers*, 207 F.3d at 434. A court must affirm the agency's factual findings even if the court believes that substantial evidence would support alternative findings. *Arkansas*, 503 U.S. 91.

Though the ALJ's decision must be "based upon consideration of all the relevant evidence," *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994), it "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Rather, at the very minimum, the ALJ's discussion must "confront evidence that does not support his conclusion and explain[n] why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d

539, 543 (7th Cir. 2003).  In this manner, the ALJ must provide a path of reasoning, with evidence

that leads logically to his conclusion.  *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996).

## III.  DISCUSSION

In her appeal, Ms. Lawrence raises two issues.  First, she argues that the ALJ's finding that

her intellectual disability, or combination of impairments, does not meet or equal Listing 12.05

was unsupported by substantial evidence.  Next, she argues that the ALJ erred at the second half

of step three by improperly evaluating the opinion evidence and reaching an unsupported mental

RFC.

These arguments do not persuade the Court.  In contrast to Ms. Lawrence's objections, the

ALJ's finding that her impairments neither met or medically equaled Listing 12.05 properly

accounts for all medical opinions and is supported by substantial evidence.  Similarly, the ALJ

appropriately weighed all opinion evidence in determining the mental RFC.

## A.      The ALJ Supported the Step Three Finding with Substantial Evidence

Ms. Lawrence argues that the ALJ's analysis concerning the *meeting* of Listings 12.05(b)

and 12.05(c) was "patently deficient," and should have included both a thorough discussion of Dr.

Grant's "initial, unwavering conclusion," as well as the ALJ's reasoning in adopting the

psychologist's later opinion in its place.  (Filing No. 15, at ECF p. 18-23).  Alternatively, Ms.

Lawrence contends that the analysis concerning the *equivalence* of Listing 12.05 was deficient

because the ALJ failed to obtain an updated medical opinion.  (Filing No. 15, at ECF p. 25-28).

The Court is not persuaded by Ms. Lawrence's attempt to elevate and sustain Dr. Grant's

initial report and full scale IQ score finding of 59 over his later opinion responding to the

observations of Dr. Unversaw, the state agency medical expert.  Put plainly:  the "two" medical

opinions tendered as evidence by Ms. Lawrence constitute one finding of Dr. Grant—one that

militates against the *meeting* of Listings 12.05(b) and 12.05(c). As Dr. Grant clearly states, the "scores in the WAIS-IV [test] may have been affected by the claimant's depression, anxiety, labile mood, and some level of attraction." ([Filing No. 8-9, at ECF p. 80](#)). As a result, the medical expert amended the initial report to support his later finding that "the claimant's intellectual functioning would be more consistent with a diagnosis of Borderline Intellectual Functioning." ([Filing No. 8-9, at ECF p. 80](#)). With his revised opinion, Dr. Grant supplanted his original diagnosis.

Ms. Lawrence relies heavily upon the initial report and asserts that the ALJ declined to "confront and resolve the evidentiary conflict" between the two reports. ([Filing No. 15, at ECF p. 19](#)). This is unconvincing when, in fact, the opposite is true: following his determination against giving weight to the initial report, the ALJ cites in the next sentence Dr. Grant's own clarification and explains that "the claimant lacks credibility and her reported low IQ score is not an accurate reflection of the claimant's intellectual function." ([Filing No. 8-2, at ECF p. 19](#)). In this manner, the ALJ did not "cherry pick from medical opinions," ([Filing No. 15, at ECF p. 20](#)) (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)), but rather specifically addressed the entirety of the evidence without assigning it the significance that Ms. Lawrence wants. *See Denton*, 596 F.3d at 426.

Ms. Lawrence contends that 20 C.F.R. § 404.1527(c) requires the ALJ to "examin[e]. . . explor[e]. . .and determin[e]" reasons for invalidating Dr. Grant's first finding and, as is implied by her logic, to make them more explicit in the opinion. ([Filing No. 15, at ECF p. 20](#)). The Court reads the regulation's prefatory guarantee – "regardless of its source, [the ALJ] will evaluate every medical opinion that [he or she] receive[s]," – less restrictively than Ms. Lawrence does, and finds that the ALJ did, in fact, adequately resolve any "evidentiary conflict." *See Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009) (explaining that an "ALJ is required to determine the weight a

nontreating physician's opinion deserves by examining how well [he] supported and explained his opinion").  In basing his analysis on Dr. Grant's clarified evaluation, (see Filing No. 8-2, at ECF p. 19), the ALJ ultimately found that the psychologist supported his own second medical opinion of Borderline Intellectual Functioning sufficiently.  (Filing No. 8-9, at ECF p. 80).

Similarly unpersuasive is the narrative alleging Dr. Unversaw's misleading assessments of the evidence and undue prompting of Dr. Grant to change his mind.  (Filing No. 15, at ECF pp. 20-23). [2]  The Court reads the communication between the state agency medical expert and Dr. Grant as it was presented in the record: the correspondence of one professional to another, requesting further clarification for what was perceived as an inconsistent assessment.  (See Filing No. 8-9, at ECF pp. 452-454) (noting that "[i]n light of [Ms. Lawrence's] adaptive [functioning], obtaining GED, and work [history], . . . would [borderline intellectual functioning] better capture her [functioning]?").

Though unintended, Ms. Lawrence's opposition to the finding of "significant functional capacity," (Filing No. 15, at ECF pp. 23-25), highlights the ALJ's reasonableness in refusing the meeting of any Listing 12.05 criteria—a determination that the Court sustains.  *Perales*, 402 U.S. at 401.  The "absent" factual basis to which Ms. Lawrence refers is actually present and placed permissibly – as well as considered at length – in the credibility and RFC section.  *See Mangan v. Colvin*, 12 C 7203, 2014 WL 1908937 (N.D. Ill. May 13, 2014) ("The Seventh Circuit has

---

[2] More specifically: the record does confirm Dr. Unversaw's representations. *Compare* (Filing No. 8-9, at ECF p. 47) ("She reported she has obtained her general education diploma in 2007."), *and* (Filing No. 8-6, at ECF p. 20) (reporting work as a CNA during 2002), *and* (Filing No. 8-5, at ECF pp. 19-25) (listing cashier jobs), *and* (Filing No. 8-5, at ECF p. 28) (reporting McDonald's work during the second quarter of 2010), *and* (Filing No. 8-6, at ECF p. 31) (reporting Ms. Lawrence "drives a car"), *and* (Filing No. 8-6, at ECF pp. 28-32, 66-72) (listing daily, routine tasks at home and for self), *with* (Filing No. 8-9, at ECF pp. 452-454) ("In light of her adaptive [functioning], obtaining GED, and work [history], her obtained scores are not consistent with this history."). Furthermore, the Court does not find either coercion or undue prompting by the state medical agency expert, as Ms. Lawrence suggests. (See Filing No. 15, at ECF p. 21) ("[T]he state agency reviewers also pressed Dr. Grant to change his mind. . . ."). The record demonstrates the opposite: after contemplating the additional information, the psychiatrist amended his opinion regarding Ms. Lawrence's intellectual functioning. (Filing No. 8-9, at ECF p. 80).

instructed courts 'to read the ALJ's decision as a whole.'" (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004))). Though the discussion comes later in the decision, the ALJ considers the last mental status examination on record in conjunction with Dr. Grant's, (Filing No. 8-11, at ECF p. 3), and notes Ms. Lawrence's "logical and goal directed thought process, appropriate thought content, good concentration and impulse control, and limited insight." (Filing No. 8-2, at ECF p. 21). Coupled with the step-by-step analysis of the mental impairment limitations, (Filing No. 8-2, at ECF pp. 18-19), the path of reasoning demonstrates that the ALJ adequately confronted evidence that does not support his conclusion and explained why it was rejected. *Kasarsky*, 335 F.3d at 543; *see also Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) ("We have long held that an ALJ is not required to provide a 'complete written evaluation of every piece of testimony and evidence.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995))); *cf. Anthony v. Astrue*, 1:10-CV-00136-DML, 2011 WL 2728059 (S.D. Ind. July 12, 2011) (remanding a determination that disregarded a proved and valid IQ test score). As a result, the ALJ's logical bridge allowed for meaningful review. *Rohan*, 98 F.3d at 971; *cf. Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("Because the *only* evidence in the record demonstrated significant limitations[,] . . . the ALJ's contrary conclusion . . . [and] unarticulated rationale for denying disability benefits generally requires remand." (emphasis added)); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (reversing and remanding because "the ALJ's opinion [did] *not even mention* the specific listings . . . [nor] the strongest piece of evidence supporting [the applicant's] claim for benefits under the listing" (emphasis added)).

Additionally, the Court finds the ALJ's analysis regarding the *equivalence* of Listing 12.05 – specifically 12.05(c) – to be free of legal error. As the Commissioner correctly points out, Ms. Lawrence carries the burden at step three to demonstrate that her combination of impairments

satisfy the criteria. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). Ms. Lawrence's

contention that the evidence reasonably raised the question of equaling the criteria of Listing

12.05(c) does not overcome this burden. *See Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir.

2009); *cf. Ribaudo*, 458 F.3d at 583-84 (vacating and remanding the ALJ's "perfunctory analysis"

that failed to either mention the relevant listing or evaluate any evidence that supported claimant's

position). Like the claimant in *Knox*, Ms. Lawrence has not presented any medical evidence

besides the revoked test and medical opinion of Dr. Grant that "support[ed] the position that [her]

impairments meet or equaled a particular listing." 327 F. App'x at 655; (see Filing No. 15, at ECF

pp. 25-28) (noting solely that the "record contains an IQ test . . . [and] an opinion by the

psychologist who performed the test"). Absent any other evidence, the Court cannot overturn the

ALJ's finding.

Likewise, Ms. Lawrence's argument that the Program Operations Manual System

("POMS") compels a separate medical consultation for the ALJ's determination, fails. With due

regard, the Court first notes that POMS has no legal force and is, therefore, not controlling. *Parker*

*for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989). The Court, however, includes this

analysis to underpin the gap in Ms. Lawrence's case. Barring instances of alleged mental

retardation that unequivocally meet Listing 12.05(a), POMS makes clear that standardized

intelligence test results are *essential*—and that the specific administered test must be "reliable . . .

[and] *valid* (be an accurate measure of what is meant by intellectual ability or intelligence)." DI

24515.055 Psychological/Psychometric Testing. As mentioned previously, Ms. Lawrence has not

produced any such essential or valid results.

The circumstance here allows the ALJ to rely heavily on the PRTF—a standardized form

completed by a psychological consultant "alert to the possibility of a coexisting mental

impairment(s), and a finding of medical equivalence . . . on the basis of a combination of impairments." See DI 24515.056 Evaluation Of Specific Issues – Mental Disorders – Determining Medical Equivalence. Retrieved Aug. 8, 2014 from https://secure.ssa.gov/poms.nsf/lnx/0424515056. Dr. Magnus facilitated the medical equivalency in such a manner by considering the record pertaining to Ms. Lawrence's mental health, (see Filing No. 8-9, at ECF p. 97), and organizing the entirety of the relevant findings in the PRTF. (Filing No. 8-9, at ECF pp. 95-96). As a result, the ALJ can, as he did here, rely upon the psychological consultant's opinion that Ms. Lawrence's combination of impairments did not equal Listing 12.05. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citing *Scott v. Sullivan,* 898 F.2d 519, 524 (7th Cir. 1990)); (Filing No. 8-2, at ECF p. 22).

In sum, the ALJ articulated his assessment at step three and assured the Court that he considered the important evidence. *Carlson*, 999 F.2d at 181.

**B.     The ALJ Supported the RFC finding with Substantial Evidence**

At the administrative hearing level, the regulatory responsibility for the assessment of a claimant's RFC lies with the ALJ. 20 C.F.R. § 404.1546(c). In ultimately finding the RFC, or the ability of an individual to perform work-related activities, the ALJ considers "all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence," may decide to adopt "all of the opinions expressed in a medical source statement," SSR 96-5p: Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved To The Commissioner, but may also decide against relying entirely on "a particular physician's opinion," or choosing between "the opinions of any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). The ALJ, in this case, considered all of Ms. Lawrence's symptoms alongside the objective medical and opinion evidence, (Filing No. 8-2, at ECF p. 20), discounted

several inconsistent opinions – including Ms. Lawrence's own – and determined an RFC to perform light work subject to numerous limitations. See *supra* Part I.D.

Ms. Lawrence argues that the ALJ erred in discounting Mr. Mardis' opinion as a medical source that demonstrated, in her view, the severity of her impairments and their effect on her ability to function. (Filing No. 15, at ECF pp. 28-32). The Court disagrees. It was within the ALJ's discretion to give "little weight" to findings that were, as noted and discussed, "overly restrictive" and "inconsistent with the longitudinal record."; *see Ziegler v. Astrue*, 336 F. App'x 563, 569 (7th Cir. 2009) (noting that an ALJ was free to "disbelieve the conclusion of [a physician]"). This is consistent with the Seventh Circuit's repeated holding that "an ALJ's 'adequate discussion' of the issues need not contain 'a complete written evaluation of every piece of evidence.'" *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)).

In discounting Mr. Mardis' opinion, the ALJ gave greater weight to the May 2011 mental status examination demonstrating Ms. Lawrence's "cooperative and friendly attitude, happy mood, bright and congruent affect," as well as the portions of the record establishing a sparse and sporadic treatment history, a robust work history, and a sufficient academic history. (Filing No. 8-2, at ECF pp. 22-22). Accordingly, the ALJ found that longitudinal, substantial evidence in the record aligned with the "assessments of the state agency psychological consultants," and chose a matching RFC. (Filing No. 8-2, at ECF p. 22). Additionally, the ALJ elucidated that Mr. Mardis, as a treating counselor, is not considered an acceptable medical source under the regulations.

Moreover, Ms. Lawrence neglects to specify or otherwise explain to the Court the findings within Mr. Mardis' opinion that would affect the outcome in the second half of step three. (Filing No. 15, at ECF pp. 28-32). Though cautious in using the harmless error doctrine articulated in

*Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010), the Court finds that the limitations within the ALJ's RFC determination already account for Mr. Mardis' finding of Ms. Lawrence's poor social functioning, (Filing No. 8-2, at ECF p. 20) (noting that Ms. Lawrence should "work primarily with things rather than people" and "with no requirement for regular interaction with the general public and with only superficial interaction with others"), and are a sufficient accommodation.  *See Schmidt*, 496 F.3d at 845 ("[T]he limitation that the ALJ imposed was consistent with [the claimant's] testimony . . . and [her physician's] opinion.").  Ms. Lawrence has not made any argument regarding which of Mr. Mardis' opinions or limitations were specifically forgotten by the ALJ, and the manner in which those opinions would alter the RFC.  Absent this step in logic, the Court does not remand on account of a discounted medical opinion at step four.  *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (declining to remand the ALJ's RFC determination).

Neither does the Court find error concerning the opinions of Dr. Grant, see *supra* Part III.A, and of Ms. Lawrence's mother, to whom the ALJ cited in his determination that Ms. Lawrence's "substantial functional activities [were] inconsistent with disability."  (Filing No. 8-2, at ECF p. 22).  Substantial evidence supportive of the RFC determination appears in both the record and the decision, (*see* Filing No. 8-2, at ECF pp. 20-22), and persuades the Court of the ALJ's careful considerations.

Similarly, the Court finds that, in light of Ms. Lawrence's inconsistencies, the ALJ properly considered her testimony and found it not credible.  (Filing No. 8-2, at ECF p. 22).  In assessing a claimant's credibility, the ALJ contemplates numerous factors including, *inter alia*, daily activities; the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; medications taken; and treatment. SSR 96-7p. Since the credibility determination is typically considered a factual matter, *Cooter & Gell v. Hartmarx Corp.*, 496 U.S.

384, 402 (1990), with the ALJ "in the best position to determine a witness's truthfulness and forthrightness," *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004), the Court defers to the ALJ and will overturn the determination only if "patently wrong." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).

Here, the ALJ was not patently incorrect in making an adverse credibility determination. Ms. Lawrence's past history of stealing from employers, (Filing No. 8-11, at ECF p. 6), and grudging admission to doing so to meet her needs, (Filing No. 8-2, at ECF pp. 44-45) ("I took the van while I was at work . . . [and] I went home."), along with denial of drug and alcohol usage to mental health providers, (see Filing No. 8-9, at ECF p. 46) ("She denied other drugs of abuse/dependence."), are valid considerations in the ALJ's evaluation of her credibility, and do not establish the patent incorrectness of the determination. See SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both *internally* and with other information in the case record. . . . *Especially important are statements made to treating or examining medical sources* and to the 'other sources' defined in 20 CFR 404.1513(e) and 416.913(e)." (emphasis added)).

In sum, the Court affirms the RFC determination. Having considered the opinion evidence alongside the medical and objective evidence, the ALJ provided a finding to which we give deference.

## IV.  CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**.


        **SO ORDERED.**


Date: 9/19/2014

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Timothy E. Burns
KELLER & KELLER
timb@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov